# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BANK OF AMERICA, N.A., not individually but derivatively on behalf of THE ESTATE OF PETHINAIDU and PARAMESWARI VELUCHAMY, <br><br> Plaintiff, <br><br> v. <br><br> ARUN VELUCHAMY et al., <br><br> Defendants. | Civil Action No. 15 CV 2075 <br><br> Bankruptcy Case No. 11-33413 <br> Adversary Case No. 12-1715 <br><br> Hon. Charles R. Norgle |

## OPINION AND ORDER

CHARLES R. NORGLE, United States District Court Judge

This matter comes before the Court to adopt the bankruptcy court's Corrected Amended Memorandum of Decision on the Entry of Final Judgment and Proposed Findings of Fact and Conclusions of Law, (the "Proposed Findings"), which were recommended by Judge Wedoff on December 18, 2014. See In re Veluchamy, 524 B.R. 277 (Bankr. N.D. Ill. 2014). After Judge Wedoff recommended the Proposed Findings, Bank of America, N.A., in its capacity as estate representative (the "Estate" or "Bank of America"); Pethinaidu ("Mr. Veluchamy") and Parameswari Veluchamy ("Mrs. Veluchamy") (collectively, the "senior Veluchamys"); the senior Veluchamys' children, Anu Veluchamy ("Anu") and Arun Veluchamy ("Arun"); and Arun's wife, Sonia Veluchamy ("Sonia") all raised or responded to various objections to the Proposed Findings. As explained in further detail below, the parties' objections are overruled and the Court adopts the entirety of the relevant parts of Judge Wedoff's Proposed Findings as the final judgment of the Court.

# I. BACKGROUND

Mr. Veluchamy is an accomplished businessman who presided over a corporate conglomerate that—at its height—included dozens of businesses located in both Illinois and India. Mr. Veluchamy turned his focus toward bank ownership, purchasing Security Bank in 1995, then Mutual Bank in 1998 (he later merged Security Bank into Mutual Bank). Mutual Bank's financial condition began to deteriorate, and in 2005, became the subject of a joint investigation between the Federal Deposit Insurance Corporation ("FDIC") and the Illinois Department of Financial and Professional Regulation ("IDFPR"). In an attempt to rescue the bank from insolvency, the senior Veluchamys personally guaranteed two loans from LaSalle Bank (now Bank of America) totaling $40 million. Subsequently, they defaulted on these loans in 2008, and the FDIC subsequently found Mutual Bank undercapitalized. When the senior Veluchamys could not recapitalize the bank, IDFPR closed the bank in July 2009. See generally Veluchamy v. FDIC, 706 F.3d 810, 812-14 (7th Cir. 2013).

On August 19, 2009, Bank of America filed actions to collect on the defaulted loan amounts from the senior Veluchamys. On December 30, 2010, Bank of America obtained judgments totaling $43 million. See Bank of Am., N.A. v. First Mut. Bancorp et al., Case No. 2009-CV-5108; Bank of Am., N.A. v. Pethinaidu Veluchamy et al., Case No. 2009-CV-5109. After obtaining the judgments, the bank moved to compel the return of assets that the Veluchamys had fraudulently transferred to friends and family. Just before that motion was set for hearing, the senior Veluchamys petitioned for bankruptcy on August 16, 2011. While their net assets were, at their height, in excess of $500 million, the senior Veluchamys reported a negative net worth of $55 million in their petition. After Bank of America, in its capacity as Estate Representative, filed an adversary action against the Veluchamys, and a hearing was held, the bankruptcy court found (and proposed findings) that the senior Veluchamys had fraudulently transferred $57,857,236 in

cash and property to Arun and Anu, and had hid another $5.5 million, plus stock and jewelry, from their creditors. See Veluchamy, 524 B.R. at 327. The Estate, the senior Veluchamys, and Arun and Anu have all filed objections. As Judge Wedoff has explained the full measure of the sordid facts surrounding this case in great detail, the Court will recite only the facts that are applicable to the pending objections.

The first objection is brought by the Estate against Sonia, and challenges the proposed finding that Sonia was not the subsequent transferee of $500,000.00 of putative debtor assets. The second objection is brought by the senior Veluchamys against the Estate, and challenges the proposed findings that (1) Mr. Veluchamy remains in control of one of his Indian corporations, Jayavelu Spinning Mill ("JSM") and consequently has the capacity to effect the turnover of $5.5 million back to the Estate and (2) the senior Veluchamys fraudulently transferred twenty-four pieces of jewelry. The third objection is brought by Arun and Anu against the Estate, and challenges the finding that they conspired with their parents and each other to defraud the senior Veluchamys' creditors and the finding that they aided and abetted the senior Veluchamys in perpetuating their fraudulent scheme.

**A. Objection One: the Estate Against Sonia Veluchamy**

Starting on September 1, 2009, and continuing through October 20, 2010, the senior Veluchamys wired $18,605,101.00 to Anu and Arun. In an effort to conceal the transfers from their creditors, the senior Veluchamys wired the money to their Indian bank accounts, and then transferred the money to their children's Indian bank accounts, who subsequently wired the money back into their (i.e. Anu's and Arun's) American bank accounts. In July 2010, Anu subsequently transferred $500,000.00 of her parents' money to Oakbrook Financial, Inc. ("OBF"), an entity that the Veluchamys formed to provide funding to their various enterprises. In her testimony, Anu characterized the transfer as a loan to Sonia so that she (Sonia) could receive 50,000 shares in

3

OBF. Sonia stated that she wanted to purchase the funds, but lacked the necessary capital to make the investment. While OBF did in fact issue the shares to Sonia, her husband, Arun repaid the $500,000.00 loan. OBF used Anu's funds transfer to pay off debts owed by another Veluchamy company, Creative Automation, to MB Financial Bank. At no time did Sonia receive any money from the senior Veluchamys, Anu, or Arun, and she held the 50,000 shares in OBF until they became worthless when OBF ceased operations.

## B. Objection Two: The Senior Veluchamys Against The Estate

### 1. The cash transfer to JSM

Mr. Veluchamy started JSM in 1994 and he, along with his wife, owned 99.99% of the company. According to the Indian Ministry of Corporate Affairs' ("MCA") Form 20B[1] that was filed by JSM in 2010, the senior Veluchamys transferred 7,999,998 shares in JSM (out of a total of ten million shares outstanding) to Anu and Arun on October 12, 2009. Approximately one month later, on November 19, 2009, Anu and Arun became directors of JSM. No consideration was paid for the stock transfer.

In July 2010, Mr. Veluchamy transferred $5.5 million to JSM's bank account at Canara Bank in India. Although Mr. Veluchamy first explained that he transferred the funds to pay down JSM's debt, no documentation of the debt, payment demands, or actual debt payments were introduced to corroborate his testimony. Next, Mr. Veluchamy produced letters from Canara bank to the Veluchamys' accountant, purportedly stating that the cash transfer was an equity contribution to JSM. But again, Mr. Veluchamy did not produce any evidence to corroborate this

---

[1] An MCA Form 20B is "an annual return filed by a company having share capital with the Registrar. . . . The Form 20B is required to contain information . . . regarding the company's registered office, the register of its members, the register of its debenture holders, its shares and debentures, its indebtedness, its members and debenture holders (past and present), and its directors, managing directors, managers and secretaries (past and present)." Pl. Ex. 351, Report of Gary G. Klienrichert 331 ¶ 541 (May 15, 2013) [hereinafter Report]. Pursuant to Indian Law, an entry on a Form 20B is prima facie evidence of share ownership. See The Companies Act § 164, No. 1 of 1956, India Code (1991), available at http://indiacode.nic.in/fullact1.asp?tfnm=195601.

4

theory of disposition: there are no records of JSM stock issuance, and JSM's records do not account for either the inflow or the outflow of the cash. The bankruptcy court found that the senior Veluchamys presented no credible evidence that JSM ever took title to the funds; only that they used the bank account as an offshore container for the money.

Subsequent to this transfer, on December 6, 2010, Anu and Arun transferred their shares back to their parents. The transferred shares (representing 80% of the ownership in JSM) finally came to rest with Mrs. Veluchamy's sister, Renugadevi, on December 9, 2010, approximately nine months before the senior Veluchamys filed their Chapter 7 Petition on August 16, 2011.

*2. The Estate's jewelry*

Beginning some time in 1997, the senior Veluchamys maintained an insurance policy with Farmers Insurance Group ("Farmers"), which covered twenty pieces of jewelry owned by the Veluchamys as of May 1, 2009. The policy's personal article endorsement included "One custom made 16¼ inch white gold necklace. 436 stone center stone 5.05 [carats]," valued at $235,000.00 (the "White Gold Necklace"). PX 523. At some point between May and July 2009, the senior Veluchamys cancelled their Farmer's policy; they took out another insurance policy with Chubb Insurance ("Chubb") on May 1, 2009. The new Chubb policy only covered six pieces, including—for purposes of the pending objections—the White Gold Necklace (still valued at $235,000.00) and a new piece, a "Diamond Flower Necklace," valued at $425,000.00.

Over the course of the next couple of years, the senior Veluchamys and their children concealed the transfers and eventual disposition of the jewelry. Anu first claimed in a June 27, 2011 deposition that, while two of the pieces listed in the Farmers schedule belonged to her, she was merely the gratuitous bailee for the remainder of the pieces, which were actually owned by relatives living in India, who brought the jewelry back to India in 2009. In addition to the jewelry listed on the Farmers schedule, Anu stated that she owned two of the six pieces listed on the

5

Chubb schedule, while her relatives in India owned the rest. The next day, Mrs. Veluchamy appeared to corroborate her daughter's testimony, telling her attorney—who relayed her statement to the bankruptcy court—that she did not recognize any of the jewelry covered by the insurance policies. At her deposition ten day later, however, Mrs. Veluchamy recanted her earlier statement, and recognized all twenty-four pieces. Mrs. Veluchamy then claimed at various points of her testimony that she gave the jewelry to Anu, to relatives living in India, or that she sold the jewelry in India for a price far below fair market value. When Anu was later asked whether her parents (or their agents) were hiding the jewelry in India, she asserted her Fifth Amendment privilege against self-incrimination and refused to testify further.

## C. Objection Three: Anu and Arun Against the Estate[2]

The primary recipients of the senior Veluchamys' fraudulently transferred assets, Arun and Anu participated extensively with their parents to move cash, corporate stock, and real property away from the reach of the senior Veluchamys' creditors. Compounding the documentary evidence that establishes the scheme, Arun and Anu consistently asserted their privilege against self-incrimination when asked about their role or the genuineness of the transactions.

*1. Fraudulent transfers of cash from the senior Veluchamys to Arun and Anu*

Starting in September 2009, the senior Veluchamys began a series of funds transfers to their children's bank accounts in India. From September 1, 2009 until October 20, 2010, the senior Veluchamys transferred $8,495,453.00 to Arun and $10,109,648.00 to Anu. While the Veluchamys originally contended that these payments were made pursuant to a series of indemnity payments, they abandoned this theory when they were presented with evidence that the agreements were falsely dated and actually created after the funds transferred. Arun and Anu each

---

[2] In their objection, Arun and Anu do not object to Judge Wedoff's proposed findings of fact, only the legal conclusions he drew from those proposed findings. Accordingly, these facts are not in dispute, and are included only to provide context for the siblings' legal objection, discussed infra.

signed these fraudulent indemnity payments after the date represented on the agreements. Neither of them could provide any information regarding the preparation or execution of these agreements. In fact, when asked about their knowledge regarding the fabrication of the agreements, they refused to answer, citing the privilege against self-incrimination provided by the Fifth Amendment.

Around this same time period on August 2, 2010, Mrs. Veluchamy, Arun, and Anu each transferred cash to Appu Hotels Limited ("Appu"). Mrs. Veluchamy transferred 14,491,180.00 rupees ("Rs") (approximately $310,000.00), Arun transferred Rs 16,880,130.00 (approximately $362,000.00), and Anu transferred Rs 14,529,330.00 (approximately $311,000.00). While no explanation for the transfer was given at the time, Appu announced in November 2010 that it had issued new stock and listed the subscribers, among them Arun and Anu. Although they received stock, the amount of stock that they received substantially exceeded the amount of money they each invested. In short, they paid far less per share than similarly-situated subscribers. Mrs. Veluchamy did not receive new stock and was not listed as a subscriber for the new issue. When Arun and Anu were asked if their parents gave them money to buy Appu stock, they asserted their privilege against self-incrimination. Because Arun and Anu received more stock than they apparently purchased, and Mrs. Veluchamy received no consideration for her transfer, the bankruptcy court found that the most likely explanation was that Mrs. Veluchamy directed Appu to issue stock in her children's names using funds she provided to Appu.

*2. Fraudulent transfers of corporate stock to Arun and Anu*

Aside from cash, the senior Veluchamys fraudulently transferred to friends and family corporate stock in various American and Indian corporations owned or controlled by the senior Veluchamys. On August 20, 2009—the day after Bank of America filed its action against the senior Veluchamys to collect on judgments totaling approximately $43 million—VMark Inc.

("VMark") issued new stock to Arun and Anu, enough to dilute the senior Veluchamys' ownership of VMark to 35% thus removing the ability of creditors to control the corporation. Before this new stock issuance, the senior Veluchamys jointly owned 70% of VMark. Less than three weeks later, on September 8, 2009, VMark caused a second round of stock (both voting and non-voting) to issue to Arun and Anu, which further diluted the senior Veluchamys' interest in VMark to 19.8% in voting stock and 52.0% in non-voting stock.

The transactions were not conducted at an arm's length. Specifically, while the evidence established that the VMark stock in the first issue was worth $2.75 per share and worth $1.99 in the second, Arun and Anu each paid only $0.63 and $0.61 per share for each issue, respectively. Continuing with their pattern, when asked how the issue price was determined or whether they purposefully paid less than the market price, both asserted their Fifth Amendment privilege against self-incrimination.

The senior Veluchamys, Arun, and Anu repeated this scheme regarding the transfer of their ownership in Creative Investments, Veluchamy LLC, Unique Mailing Services, Inc., Jayavelu Spinning Mill Ltd., Parameswari Spinning Mill Ltd. ("PSM"), Dharani Sugars & Chemicals Ltd., Appu, and Versatile Card Technology (P) Ltd. ("VCT India"). In each instance, Arun and Anu either paid far below the fair market value for the stock or paid nothing at all. When asked about their knowledge regarding the genuineness of the transactions (i.e. how the purchase price was derived, whether the transfers were made to defraud creditors, etc.), Arun and Anu would assert their privilege against self-incrimination and refuse to answer.

*3. Fraudulent transfers of real estate located in Illinois and India*

Aside from the transfers of cash and corporate stock, the senior Veluchamys, Arun, and Anu facilitated the fraudulent transfer of three commercial properties located in Downers Grove, Illinois, and another parcel of commercial property located in Chennai, Tamil Nadu, India. With

respect to the Downers Grove properties, Mr. Veluchamy transferred approximately $4 million into an E-Trade account jointly held by Arun and Anu; the two then used that money, together with money already transferred to them by their parents and mortgage loan proceeds, to purchase the properties. As with the other contested transactions, the siblings asserted their privilege against self-incrimination when asked about details of the real property transactions.[3]

After the hearing, Judge Wedoff proposed a finding that Arun and Anu were jointly and severally liable to the Estate in the amount of $57,857,236.00, and were required to surrender their shares in Creative Investments, Veluchamy LLC, and VCT India to the Estate.

## II. DISCUSSION

As an initial matter, the Court notes that the parties have only submitted their objections, without including any supporting documentation. Federal Rule of Bankruptcy Procedure 9033 states that "A party objecting to the bankruptcy judge's proposed findings or conclusions shall arrange promptly for . . . such portions of [the record] as all parties may agree upon . . . ." Fed. R. Bankr. P. 9033(b). In their Joint Status Report, the parties have represented that "[t]he objections are fully briefed and ready for resolution," Joint Status Report 2. As the parties have apparently agreed that these materials are all that are required to support the objections, the Court will proceed to a discussion of the merits of each parties' objections.

**Standard of Decision**

For non-core proceedings, once the bankruptcy judge issues his proposed findings of fact and conclusions of law, any party to the litigation may object to the proposed findings or conclusions. See 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(b). The district court reviews *de*

---

[3] The bankruptcy court did not make an explicit finding as to whether Arun asserted his Fifth Amendment right against self-incrimination in conjunction with the real estate transactions. But his pattern of conduct regarding the other fraudulent transactions, combined with his failure to object to the finding of liability against him, demonstrate the high likelihood that Arun asserted his Fifth Amendment protection whenever possible.

9

*novo* any matters to which a party objects, and then enters a final order based upon the bankruptcy judge's decision. Fed. R. Bankr. P. 9033(d); see also Wellness Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1940 (2015).

## A. The Estate's Objection

In its objection, the Estate claims that the bankruptcy court incorrectly found that Sonia Veluchamy was not a transferee of Estate property. Under Section 550(a), the trustee may recover estate property (or its equivalent value) from either the initial transferee of the property "or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." See 11 U.S.C. §§ 550(a)(1), (2). The Estate argues that Sonia either (1) initially received property (or an associated benefit) from the estate or (2) received the property as an immediate transferee of Anu, the senior Veluchamy's initial transferee. In contrast, Sonia argues that she cannot be a transferee—whether initial or immediate—because she never received the property nor any benefit from the property.

While the Bankruptcy Code does not define "transferee," the Seventh Circuit has never deviated from its nearly thirty-year-old-requirement that transferees must have "dominion over the money or other asset, the right to put the money to one's own purposes." See Bonded Fin. Servs., Inc. v. European Am. Bank., 838 F.3d 890, 893 (7th Cir. 1988), cited with approval in Paloian v. LaSalle Bank, N.A., 619 F.3d 688, 691-92 (7th Cir. 2010). In addition, "[t]he paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor—someone who receives the benefit but not the money." Bonded Fin. Servs., 838 F.2d at 895.

In this case, Anu transferred $500,000.00 of the senior Veluchamys' cash to OBF, which she represented as a "loan" to Sonia to buy 50,000 shares of OBF stock, with a purported value of $500,000.00. Sonia's husband, Arun, later paid off his sister's loan on Sonia's behalf. But the Estate introduced no evidence proving what property of the senior Veluchamys that Sonia

10

received. Unpacking the transactions, Anu transferred $500,000.00 of the senior Veluchamys' cash to OBF, which OBF used to pay off creditors. Next, OBF issued 50,000 shares of its stock to Sonia that she subsequently held until the shares became worthless when OBF ceased operations. Third, Arun repaid the "loan" that Anu extended to Sonia.

All of the Estate's theories fail. First, Sonia cannot be an "initial transferee" because she did not receive any property from the senior Veluchamys. Second, she received no benefit from the funds transfer, only a large quantity of worthless stock; OBF and its creditors actually received the benefit of Anu's cash transfer. Third, Sonia cannot be an immediate or mediate transferee of the property because, notwithstanding the form of the transaction, at no time did Sonia enjoy an entitlement to or dominion over the money; she was never "free to invest the whole [$500,000.00] in lottery tickets or uranium stocks." See Bonded Fin. Servs., 838 F.2d at 894. She never sold the stock, and held the shares until they became worthless when OBF dissolved. The Estate established only that OBF received the funds, not Sonia. Moreover, she desired to purchase the shares with her own money, not the senior Veluchamys' assets; the bankruptcy court properly found that the shares issued to Sonia was not a transfer intended to defraud creditors. Accordingly, the Court overrules the Estate's objection and adopts Judge Wedoff's findings as they relate to Sonia Veluchamy.

## B. The Senior Veluchamy's Objections

In their objections, the senior Veluchamys object to two findings proposed by the bankruptcy court. First, they object to the proposed order requiring turnover of approximately $5.5 million that was transferred to an Indian bank account nominally owned by JSM. Second, they object to the schedule of jewelry subject to turnover that was proposed by Judge Wedoff, claiming that the schedule double-counts the Diamond Flower Necklace.

*1. The $5.5 million transferred to JSM*

Once a debtor files his petition for bankruptcy, his estate is created from all of the debtor's currently-owned property, subject to some exceptions not relevant for the purposes of this matter. 11 U.S.C. § 541(a). Although the estate may be formed from the debtor's property, the debtor often does not have actual custody over the property. In such instances, the trustee is required to obtain a turnover order to recover the property that is in another's custody. See id. § 542(a); see also In re USA Diversified Prods., Inc., 100 F.3d 53, 55-56 (7th Cir. 1996) (distinguishing transferees from possessors). The test to determine whether a custodian of property is a transferee or possessor is one of entitlement. If the third-party is able to direct the funds for its own purposes then it is a transferee; the trustee must avoid the transfer under Section 548 of the Code and then recover the property under Section 542. See Bonded Fin. Servs., 838 F.2d at 894. But if the custodian merely possesses the property on behalf of the debtor, and cannot use the funds itself, then it is a possessor and must turn over the funds to the trustee. See USA Diversified Prods., 100 F.3d at 56 ("A transferee claims an entitlement to the money; entities targeted by section 542 do not.").

In this case, the senior Veluchamys argue that the $5.5 million deposited into JSM's bank account cannot be the subject of a turnover action because they relinquished control over the money when they sent it to JSM's bank account in India, and later transferred ownership of JSM to Renugadevi, albeit fraudulently. Because—they contend—JSM was a necessary party (as owner of the bank account), and was not joined in the action, the Estate cannot claim title to the transferred money.

In response to the senior Veluchamys' objection, the Estate maintains that the question is not whether the third-party had custody or control over the money, but whether the third-party claimed title over the money. The Court agrees. Although the evidence demonstrates (and the

12

parties do not dispute) that the senior Veluchamys sent $5.5 million to Canara Bank in India for deposit into JSM's bank account, the debtors presented no credible evidence that JSM took title to the funds. There is no evidence to show that JSM treated the transfer as a debt payment because there is no documentation memorializing the transfer, no payment demands from JSM's creditors, and no actual debt payments to corroborate Mr. Veluchamy's original explanation for the funds transfer. Additionally, there is no evidence that JSM treated the money as an equity contribution because there is no evidence of stock issuance by JSM, and JSM's records do not account for the receipt or distribution of $5.5 million. Instead, all of the credible evidence shows that the senior Veluchamys sent the money to JSM with the apparent belief that once the money left their hands, and was placed in an account they no longer owned, it would be shielded from their creditors. This assumption is contrary to established law. Because there is no credible evidence to show that JSM asserted an entitlement to the $5.5 million, the Court overrules the senior Veluchamys' objection and adopts Judge Wedoff's findings and order regarding the disposition of the money transferred to JSM.

### 2. The alleged duplicate jewelry

The senior Veluchamys also object to the bankruptcy court's finding that they own twenty-four pieces of jewelry, claiming that one of the pieces—the "Diamond Flower Necklace"—was listed twice on Chubb's schedule of insured items. They do not object to the proposed finding that they own the remainder of the pieces. The Court does not agree with their contention regarding the alleged duplicate. The senior Veluchamys originally insured their jewelry with Farmers. The relevant piece listed on the Farmers schedule was described as "One custom made 16¼ inch white gold necklace. 436 stone center 5.05 [carat]. Included appraisal on file with all details." PX 523. The White Gold Necklace had an appraised value of $235,000.00. Later, when the senior Veluchamys switched from Farmers to Chubb, they insured six pieces of jewelry: two transferred

13

from Farmers (including the White Gold Necklace listed as item number three) and four new pieces, including the Diamond Flower Necklace listed as item number two. On the Chubb schedule, the White Gold Necklace was listed with an appraised value of $235,000.00—the same value it had with Farmers.

In short, the senior Veluchamys' argument—that the White Gold Necklace and the Diamond Flower Necklace are the same—requires the Court to find that not only did the senior Veluchamys double-pay an insurance premium for over two years, but that Chubb either did not know, or did not care, that it was charging them twice to insure the same piece of jewelry—and had valued the same piece of jewelry at radically different amounts ($235,000.00 versus $425,000.00). Such an incredible theory should have some corroborating evidence (e.g. a statement from Chubb explaining the double charge, a refund check, or even additional witness testimony) to support it. But none was presented to the bankruptcy court; Mrs. Veluchamy merely testified that she did not realize Chubb counted the Diamond Flower Necklace twice until after the senior Veluchamys filed their bankruptcy petition. Such a contention borders on the preposterous. The senior Veluchamys' objection, that the bankruptcy court double-counted the Diamond Flower Necklace, is overruled, and the Court adopts Judge Wedoff's finding regarding the schedule of jewelry that is subject to turnover.

## C. Arun's and Anu's Objections

Finally, Arun and Anu object to Judge Wedoff's proposed conclusion that they are subject to joint and several liability for aiding and abetting their parents in the fraudulent scheme, and to the finding that they engaged in a conspiracy with their parents to defraud creditors. Without citing any law, Arun and Anu first argue that they cannot be held jointly and severally liable for their misconduct for the sole reason that the Estate did not explicitly ask for such relief in its complaint. While they are correct that Federal Rule of Civil Procedure 8(a)(3) requires the plaintiff to make

"a demand for the relief sought" in the complaint, they ignore another rule of civil procedure, namely Rule 54, which allows the court "to grant the relief to which each party is entitled, <u>even if the party has not demanded that relief in its pleadings</u>." Fed. R. Civ. P. 54(c) (emphasis added). Because Illinois law provides "[c]o-conspirators are jointly and severally liable for each other's actions," see In re Liebl, 434 B.R. 529, 538 (Bankr. N.D. Ill. 2010), joint and several liability is appropriate for the actions undertaken by Arun and Anu.

Arun and Anu next assert a different theory why they cannot be held jointly and severally liable for each other's actions: "To create joint and several liability for Arun and Anu for aiding and abetting, each of Arun and Anu [*sic*] must have aided and abetted each other." Arun Veluchamy and Anu Veluchamy's Objs. to Proposed Findings of Fact and Conclusions of Law ¶ 11 [hereinafter "A&A Objs."]. This argument similarly is devoid of any legal support, and the Court therefore rejects it outright. See Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill., 424 F.3d 659, 664 n.2 (7th Cir. 2005) ("[*D*]*e novo* review does not mean that [the Court] must make and support the parties' arguments for them.").

Third, Arun and Anu state that there is no basis to find that they engaged in a conspiracy with their parents to facilitate fraudulent transfers of their parents' wealth because "there is no clear and convincing evidence that a conspiracy was formed *prior to* the completion of the actual transfers for which Arun and Anu were held individually liable." A&A Objs. ¶ 13. Without citing any support, Arun and Anu contend that the Court should reject the bankruptcy court's proposed finding that they engaged in conspiracy with their parents because the Estate never proffered an explicit agreement, complete with terms and an execution date. But explicit terms are not required to prove conspiracy; circumstantial and inferential evidence, "coupled with commonsense knowledge of the behavior of persons in similar circumstances" is all that the law requires. See

Adcock v. Brakegate, Ltd., 645 N.E.2d 888, 895 (Ill. App. Ct. 1994) (noting that "conspirac[ies] are] rarely susceptible of direct proof").

Here, the extensive evidence shows that Arun and Anu were the main transferees of the senior Veluchamys' property. They signed fraudulent "indemnity agreements," accepted funds transfers that they subsequently repatriated back to their parents, and otherwise orchestrated the removal of their parents' assets out of their estate and out of reach of their parents' creditors. Adding to the evidence against them, when Arun and Anu were asked about their role in the scheme, both brother and sister asserted their Fifth Amendment privilege, allowing the Court to draw a negative inference against them. See Lightspeed Media Corp. v. Smith, 761 F.3d 699, 705 (7th Cir. 2014). The evidence in this case overwhelmingly supports a finding that Arun and Anu engaged in a conspiracy to defraud the senior Veluchamys' creditors. Accordingly, the Court overrules their objection and adopts the findings of Judge Wedoff as they relate to Arun's and Anu's role.

### III. CONCLUSION

The Court overrules the objections made by Bank of America, N.A., Pethinaidu and Paramaswari Veluchamy, and Arun and Anu Veluchamy, and adopts the relevant parts of Judge Wedoff's Corrected Amended Memorandum of Decision on the Entry of Final Judgment and Proposed Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: August 18, 2015